IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
**FILED**

MAR 0 1 2016

David J. Bradley, Clerk of Court

Vaughn Monroe # 1967416,                                    )
                    Plaintiff,                              )

V.                                                          )

(1) John Doe I-Director-UTMB-Galveston, Tx.                 )

(2) Brad Livingston-Executive Director-TDCJ-Huntsville, Tx. )

(3) Dr. L. Linthicum-Medical Director-TDCJ-Huntsville, Tx.  )

(4) Joseph Curry-Physicians Assistant-UTMB-Huntsville, Tx.  )

(5) Joe Morgan-Practice Manager-UTMB-Huntsville, Tx.        )

(6) Dr. Rohit Venkatesan-MD-UTMB-Galveston, Tx.             )

(7) Dr. Roger Soloway-MD-UTMB-Galveston, Tx.                )  Civil Action No.

(8) Steve Miller-Warden-Byrd Unit-TDCJ-Huntsville, Tx.      )

(9) Dr. B. Williams-Unit Physician-UTMB-Huntsville, Tx.     )  _____

(10) M. Roesler-Warden-Ellis Unit-TDCJ-Huntsville, Tx.      )

(11) Mr. Roark-Physicians Assistant-UTMB-Galveston, Tx.     )

(12) Dr. Ripsin-Unit Physician-UTMB-Livingston, Tx.         )

(13) Dr. Briscoe-Unit Physician-UTMB-Livingston, Tx.        )

(14) Todd Harris-Warden-Polunsky Unit-TDCJ-Livingston, Tx.  )

Individually and in their Official Capacities,

                    Defendants.

---

## I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of State Law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

1.

2. The United States District Court for the Southern District of Texas, Houston Division is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where eleven of the fourteen Defendants were employed and by and through their employment a majority of the events giving rise to this claim occurred.

## II. PLAINTIFF

3. Plaintiff, Vaughn Monroe, is and was at all times mentioned herein a prisoner in the Federal Bureau of Prisons and/or a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined at the Polunsky Unit in Livingston, Tx.

## III. DEFENDANTS

4. (1) John Doe I-Director for the University of Texas Medical Branch-UTMB at 301 University Blvd., Galveston, Tx. 77555, is legally responsible for the overall operations of the University of Texas Medical Branch, it's employee's and patients under UTMB's care.

5. (2) Brad Livingston-Executive Director for the Texas Department of Criminal Justice-TDCJ at 2 Financial Plaza, Huntsville, Tx. 77340, is legally responsible for the overall operations of the Texas Department of Criminal Justice and its employee's including contract employee's. The Executive Director of TDCJ is also legally responsible for the custody, care and safety of all inmates confined in TDCJ institutions.

6. (3) Dr. L. Linthicum-Medical Director for the Texas Department of Criminal Justice at 2 Financial Plaza, Huntsville, Tx. is legally responsible for all medical personnel employed by or under contract with TDCJ to provide health care to the inmates confined in TDCJ institutions. Dr. Linthicum is also responsible for the overall health care of inmates in TDCJ institutions.

7. (4) Joseph Curry-Physicians Assistant for UTMB works at the Byrd Unit-TDCJ at 21 FM 247, Huntsville, Tx. 77320. His responsibility is to provide

2.

health care to inmates confined at the Byrd Unit - TDCJ.

8. (5) Joe Morgan - Practice Manager for UTMB works at the Byrd Unit - TDCJ at 21 FM 247, Huntsville, Tx. 77320. his responsponsibility as practice Manager is to insure all UTMB personnal assigned to the Byrd Unit perform their duties in compliance with the Correctional Managed Care Contract between UTMB and TDCJ, to provide health care to inmates confined there.

9. (6) Dr. Rohit Venkatesan - MD for the University of Texas medical Branch-UTMB at 301 University Blvd., Galveston, Tx. 77555 is a Medical Doctor specializing in Gastrointerology for UTMB at the Galveston Hospital.

10. (7) Dr. Roger Soloway - MD - for the university of Texas Medical Branch -UTMB at 301 University Blvd., Galveston, Tx. 77555 is a Senior Medical Doctor specializing in Gastrointerology for UTMB at the Galveston Hospital.

11. (8) Steve Miller - Warden for the Byrd Unit - TDCJ at 21 FM 247, Huntsville, Tx. 77320 is legally responsible for the overall operations of the Byrd Unit and it's employees. Warden Miller is also legally responsible for the custody, care and safety of all inmates confined at the Byrd Unit.

12. (9) Dr. B. Williams - Unit Physician for UTMB works at the Ellis Unit-TDCJ at 1697 FM 980, Huntsville, Tx. 77343. Dr. Williams is responsible for providing health care to inmates confined at the Ellis Unit - TDCJ.

13. (10) M. Roesler - Warden for the Ellis Unit - TDCJ at 1697 FM 980, Huntsville, Tx. 77343, is legally responsible for the overall operations of the Ellis Unit and its employees. Warden Roesler is also legally responsible for the custody, care and safety of all inmates confined at the Ellis Unit.

14. (11) Mr. Roark - Physicians Assistant - for the University of Texas Medical Branch - UTMB at 301 University Blvd., Galveston, Tx. 77555, is a Physicians Assistant specializing in Gastrointerology medicine for UTMB at the Galveston Hospital.

3.

15.    (12) Dr. Ripson  –  Unit Physician for UTMB works at the Polunsky Unit-TDCJ at 3872 FM 350 S., Livingston, Tx. 77351. Dr. Ripson is responsible  for providing health care to inmates confined at the Polunsky unit – TDCJ.

16.    (13) Dr. Briscoe  – Unit Physician for UTMB works at the Polunsky Unit-TDCJ at 3872 FM 350 S., Livingston, Tx. 77351. Dr. Briscoe is responsible  for providing health care to inmates confined at the Polunsky Unit – TDCJ.

17.    (14) Todd Harris – Warden for the Polunsky Unit – TDCJ at 3872 FM 350 S. Livingston, Tx. 77351, is legally responsible for the overall operations    of the Polunsky Unit and its employees. Warden Harris is also legally responsible for the custody, care and safety of all inmates confined at the Polunsky Unit.

18.    Each defendant is sued individually and in his official capacity. At all times  mentioned in  this  complaint  each defendant acted under the color of State Law.

## IV STATEMENT OF CLAIM

19.    Plaintiff herein  alleges that the defendants have acted with Deliberate Indifference to his serious medical needs and have failed to protect plaintiff from the risk of serious harm.

20.    Defendants continue  to  treat  plaintiff with powerful medicines which have  serious  and potentially life threatening side effects long after plain-tiff  was  told  he  did  not have the disease for which he was being treated.

21.    Defendants have deliberately delayed further testing to determine if  the plaintiff  actually  has,  or  has ever had, the disease for which he is being treated when previous tests indicated no active signs of the incurable disease.

22.    As a result of the severe side effects of the medicines and the unreason-ably inadequate medical attention, plaintiff health has deteriorated and    he suffers from constant and debilitating pain.

4.

23.   Defendants have consistantly ignored plaintiff's   numerous   cries   for

help and in so doing has failed to protect the plaintiff from   the   risk   of

serious harm in the past, present and in the future.

24.   Defendants,   by   and   through   their   actions, have violated Plaintiff's

Constitutional   Right   to   be   free from cruel and unusual punishment afforded

him under the Eigth Amendment of the Constitution.

### V. FACTUAL ALLEGATIONS
### FEDERAL CUSTODY

25.   In 2011   Plaintiff   was   serving   a federal sentence at the

Federal Bureau of Prisons - Correctional Complex in Beaumont, Tex.

26.   During the time Plaintiff was confined at the Federal   Com-

plex in Beaumont the University of Texas Medical Branch was under

contract   with   the   Bureau   of Prisons to provide health care to

inmates confined there.

27.   While   at   the   Federal   Complex in 2011 Plaintiff visited the infirmary

with   complaints   of   severe pain in his lower right abdoman and other issues.

Plaintiff was examined then referred to a Gastrointerologist   (GI)   Specialist

for a consult.

28.   During the   consult   with   the GI Specialist Plaintiff was told he would

be scheduled for a CT Scan procedure of his mid-section.

29.   On August 18, 2011, Plaintiff was escorted to the Baptist Hospital    in

Beaumont, Texas where a CT Scan of his mid-section was administered.    (See

Exhibit   A, 1 & 2)

30.   The impression   given   in   the Diagnostic Imaging Report of the CT Scan

Revealed; "...Highly Suspicious For Crohn's Disease / Regional Eneteristis...

(See Exhibit A, 1).

31.   After the August 18, 2011, CT Scan procedure during a follow up consult with the Clinical Director at the Federal Complex in Beaumont, Plaintiff   was told he had Crohn's disease. This conclusion was said to have been based   on the results of the CT Scan. Treatment for Crohn's disease was   initiated   at that time.

32.   After   treatment   for Crohn's disease was initiated   Plaintiff was sche-duled to have a Colonoscopy. On December 22, 2011, Plaintiff was escorted   to the Baptist Hospital in  Beaumont,  Texas  where  a  Colonoscopy procedure was administered.

33.   The impression  of  the  Diagnostic   Imaging Report from the colonoscopy administered on Dec. 22, 2011, revealed; "compared to the recent CT Scan, this is a dramatic interval improvement since the remaining portions of the   ileum and the proximal small bowel are all  normal.  (See Exhibit, B, 1).

34.   During a follow up consult with the GI Specialist Plaintiff was told the results  of the colonoscopy procedure on Dec. 22, 2011, were "clean" and "nor-mal."

35.   Though the  initial  CT Scan  was inconclusive and "suspicious" and the subsequent  colonoscopy  was "clean" and "normal," Plaintiff was still treated for  Crohn's  disease.  In  fact  his  condition worsened and the strength and dosage  of  medicines  used  to treat him for Crohn's disease were  increased.

36.   As a result of Plaintiff's condition worsening he was transferred to   a Federal  Medical  Facility  in  Ft.  Worth, Texas. Upon arrival at the Federal Medical  Center  and during the subsequent two years he spent at that facility Plaintiff  was  treated  for  Crohn's disease based on medical records created by UTMB and maintained in the Bureau system.

37.   Plaintiff  was  continously  treated  for Crohn's disease by the Federal Bureau  of  Prisons  until his release from Federal custody on Sept. 28, 2014.

## STATE CUSTODY

**38.**   On October  20, 2014, Plaintiff was taken into State custody and confined at the Harris County Jail in Houston, Texas.

**39.**   At the time Plaintiff was confined in the Harris County Jail the University of Texas Medical Branch-UTMB was under contract with the jail to provide health care to inmates confined there.

**40.**   Plaintiff was treated at the Harris County jail by UTMB medical personnel for Crohn's disease based on records maintained in UTMB's archived records system and such records were  initially created by UTMB while Plaintiff was in Federal custody.

**41.**   On Dec. 22, 2014, Plaintiff was transferred to the Texas Department of Criminal Justice - TDCJ to the Holiday Unit in Huntsville, Texas.

**42.**   While at the Holiday Unit Plaintiff was treated for Crohn's disease by UTMB medical personnel. UTMB staff used the stored medical records archived in UTMB's computor system to base their treatment of plaintiff.

## FEDERAL CUSTODY

**43.**   On Feb. 2, 2015, Plaintiff was taken into Federal Custody on a Bench Warrant filed in the Eastern District of Texas for a Federal Supervised Release Revocation Hearing.

**44.**   Plaintiff was away from TDCJ custody on the Federal Bench Warrant from February 2015 until September 2015. During that eight month absence Plaintiff was treated for Crohn's disease based on records which had followed him.

**45.**   Since 2011 when UTMB first diagnosed plaintiff with Crohn's disease a summary of that diagnosis has followed him whenever he goes. The treatment prescribed to plaintiff for Crohn's disease is continued whenever he goes based on UTMB's records.

7.

## STATE CUSTODY

**46.**   On Sept. 10, 2015, Plaintiff was returned to TDCJ to the Byrd Unit    in Huntsville, Texas. Upon arrival plaintiff was seen by Katy Tyler-RN, for    an intake screening. Plaintiff notified Ms. Tyler that he was having severe  pain in his lower right abdomen  and in his hands. Ms. Tyler told Plaintiff he would be seen by the "doctor" within three days.

**47.**   The "doctor" Ms.  Tyler  referred to is actually Joseph Curry, a Physicians  Assistant,  and  not  a  doctor at all. During the two and a half months at the Byrd Unit Plaintiff never saw a doctor working there.

**48.**   On Sept. 11, 2015, Plaintiff was in his cell sleeping when he was awaken by  a  sharp  stabbing pain in his lower right abdomen. A correctional officer observed the plaintiff in pain and called the infirmary for assistance.

**49.**   Mr. Ortega-RN arrived at the cell-block where plaintiff was housed, with a wheelchair, plaintiff was then taken to the infirmary.

**50.**   In the infirmary Mr. Ortega took plaintiff's vital signs. After that Mr. Ortega called  Mr.  Curry  to  the examination room. As Mr. Curry entered the examination room he said, "He doesn't look too distressed to me."

**51.**   Mr. Curry then stood about six feet behind the plaintiff and spoke    to plaintiff's  back.  He  asked  plaintiff  what had happened and when plaintiff tried  to  explain  Mr.  Curry  interupted  and said, "Welcome to Prison," The Mr. Curry left the room.

**52.**   Plaintiff was then given an EKG and taken to an X-Ray room for an X- Ray of his mid-section. Plaintiff was then taken to Mr. Curry's office where   Mr. Curry told plaintiff the X-Ray showed plaintiff's bowel to be full.

**53.**   Mr. Curry then prescribed  a  Fiber-Laxitive for plaintiff claiming it would  help with his constipation. Then plaintiff was prescribed a non-aspirin for  the  pain  he  was having. Plaintiff requested something stronger for the

8.

pain since it was severe, but Mr. Curry denied the request then sent Plaintiff back to his cell-block.

54.  On Sept. 14, 2015, Plaintiff was seen by Mr. Curry for his initial examination. Mr. Curry commented as plaintiff entered his office, "why am    I seeing you again, I just saw you last week." (See Exhibit C, 1-2).

55.  The examination lasted less than five minutes and when plaintiff was told to leave plaintiff asked Mr. Curry if they could discuss plaintiff's medical history, Mr. Curry did not respond.

56.  Plaintiff then tried to show Mr. Curry a copy of a health summary report from the Federal Bureau of Prisons that had a list of plaintiff's fourteen current chronic care issues condensed into a one page report. Mr. Curry became angry and abrasive. Mr. Curry told plaintiff to leave his office or else   the plaintiff would be in trouble. (See Exhibit D, 1).

57.  Plaintiff exited the office but commented to Mr. Curry before leaving that he only wanted his medical issues addressed and that he would file a grievance. Mr. Curry responded, "File whatever you want, it won't matter."

58.  On Sept. 15, 2015, Plaintiff submitted a grievance marked as "Urgent Medical Issue," regarding Mr. Curry's conduct and inattention to plaintiff's serious medical needs. ( See Exhibit E, 1-5).

59.  On Sept. 17, 2015, plaintiff met with Mr. Curry after having submitted a Sick-Call request to discuss issues Mr. Curry had refused to speak to plaintiff about during the initial examination.

60.  During this meeting Mr. Curry only allowed the plaintiff to discuss three issues. Plaintiff mentioned the fact he had a fungal infection that had been present for a year, the fact that plaintiff had lost twenty pounds of of muscle mass in a short period of time and the fact plaintiff has a leg length discrepancy and requires medical footwear.

9.

61.   In response to the three issues mentioned by plaintiff, Mr. Curry pre-scribed an Anti-Fungal Cream for the infection. Plaintiff advised Mr. Curry that he'd used the same cream before and that not only was it ineffective, it made his rash worse, Mr. Curry said, "try it Anyway." (See Exhibit F, 1).

62.   Regarding plaintiff's second issue of the unexplained weight loss Mr. Curry refused to order a Hyper Choloric Diet or protien supplements for the plaintiff. In the end Mr. Curry did nothing.

63.   Regarding plaintiff's third issue discussed at that meeting concerning his leg length discrepancy and need for medical footwear Mr. Curry told Plain-tiff to take that issue up with the next institution.

64.   Plaintiff made one last attempt to have the fungal infection issue addressed. Plaintiff to a dermatologist. Mr. Curry refused to make the referral.

65.   On Sept. 15, 2015, Plaintiff wrote to Joe Morgan-Practice Manager and asked for a meeting to discuss Mr. Curry's conduct. Mr. Morgan refuse to meet with plaintiff and responds that plaintiff is being treated appropriately. (See Exhibit G, 1-2).

66.   On Oct. 6, 2015, inmate Gary Jennings # 1836900 was moved into the cell with plaintiff. Inmate Jennings advised plaintiff that he was a TB diagnosed inmate on TB medicines. (See Exhibit H, 1-2).

67.   Plaintiff was taking HUMIRA injections at the time Mr. jennings was placed in the cell with plaintiff. One of the main side effects of HUMIRA is that it makes the patient a high risk of contracting TB.

68.   On Oct. 10, 2015, plaintiff was seen by Mr. Curry after submitting a Sick-Call Request about the continued pain plaintiff was having in his lower right abdomen and hands. Mr. Curry prescribed two pain medicines for one week. (See Exhibit I, 1).

69.   On Oct. 11, 2015, plaintiff submitted a grievance about the continued

10.

inadequate medical care he was receiving. (See Exhibit J, 1-5).

70. On Oct. 15, 2015, plaintiff was taken to Galveston Hospital to have a CT Scan of his mid-section. Before the procedure the plaintiff advised the technician that his bowel was full due to constipation and/or blockage, Plaintiff asked for a cleaning before the procedure, but the technician refused and conducted the procedure anyway. (See Exhibit K, 1-3).

71. On Oct. 22, 2015, plaintiff was in the infirmary waiting area at the Byrd Unit waiting to be seen by Mr. Curry-PA. While waiting there plaintiff was able to speak to Joe Morgan-Practice Manager.

72. Plaintiff explained to Mr. Morgan that the medicines plaintiff was taking causes him to be at a high risk for contracting TB and that a TB diagnosed inmate had been placed in the cell with plaintiff.

73. Mr. Morgan claimed that it was impossible that an inmate with TB would be placed in the general population. Plaintiff tried to show Mr. Morgan an affidavit signed by the inmate who'd been placed in the cell with Plaintiff but Mr. Morgan would not look at it.

74. On Oct. 22, 2015, Plaintiff was seen by Mr. Curry after having submitted a request to have his pain medicine prescription re-filled. Upon entering Mr. Curry's office Mr. Curry commented, "You look healthy enough, what's your complaint," Plaintiff explained he was there to get his pain meds re-filled (See Exhibit L, 1-2).

75. Mr. Curry then typed on his computer key-board then turned the screen around so that the Plaintiff could see it. On the screen was the results of the CT Scan procedure from Oct. 15TH.

76. Mr. Curry had one line in particular highlighted from the CT Scan report. He showed it to Plaintiff. It read, "No signs of active chronic disease." Mr. Curry said to Plaintiff as he showed him the CT report, "You don't have Crohn's

disease so I'm not going to refill your pain medicines."

77.  At that point plaintiff expressed his concerns of being treated for   a disease he  is now being told he does not have. Plaintiff also wanted to know what  the  pain  was in his lower right abdomen that he'd previously been told was Crohn's disease.

78.  Plaintiff  also  asked  Mr.  Curry what was the cause of the pain in his hands  if it was not a result of Crohn's disease as he'd previously been told.

79.  Mr. Curry offered no explanation to Plaintiff and only said, "take it up with the people in Galveston".

80.  On  Oct.  30,  2015,  Plaintiff  was  taken  to Galvestion Hospital for a follow-up  consult with a G.I. Specialist. There plaintiff met with Dr. Venka- tesan. At first meeting with the doctor plaintiff learned the specialist  had not yet reviewed the CT Scan from Oct. 15, 2015. (See Exhibit M, 1-8).

81.  The purpose of the consult with Dr. Venkatesan was to discuss the results of  the  CT-Scan.  During  the  visit  the specialist said he would review the CT-Scan later then he proceeded with the consult.

82.  After a  brief  consult with plaintiff the doctor said he would schedule the  plaintiff  for  a  colonoscopy. Dr. Venkatesan explained to plaintiff the procedure would be administered within two to three weeks and that a follow-up consult  with  a GI Specialist would be scheduled within four weeks to discuss the results of the colonoscopy.

83.  Plaintiff  discussed  his pain issues with the doctor and asked for pain medicines. Dr. Venkatesan said  he  would not prescribe pain medicine until after he review the results of the colonoscopy. The doctor said he would   try to get the procedure done quickly but at most it would be three weeks.

84.  In  Dr. Venkatesan's report of the Oct. 30, 2015, consult with Plaintiff it  is  noted,  "His pain at this time does not seem to be related to Crohn's.

CT is negative..." (See Exhibit M, 4).

85.   Dr. Venkatesan's recommendation in his report says: 1, Restart Bulk Fiber Laxative, 2. Needs Colonoscopy, will schedule, 3. Stop all opiates   and 4. Follow up telemedicine 2-4 weeks.

86.   Regarding  Dr. Venkatesan's recommendations. First the doctor prescribes Fiber Laxative for  six months though the warnings say "Do not use more than one week." The colonoscopy ultimately was scheduled for five months into   the future after  scheduling  the  follow-up  for December only eight weeks after the consult.

87.   This is important because Dr. Venkatesan discontinued all pain medicines while  plaintiff  was  waiting  for a colonoscopy. Essentially plaintiff would suffer severe pain for at least five months which is exactly what has happened.

88.   Additionally,  no  attention  has  been given to plaintiff's pain and no attempts have been made to  determine  what the cause of the pain might be despite Dr. Venkatesan's comment that the pain seems to be unrelated to Crohn's.

89.   Finally Dr. Venkatesan orders  a Lactose-Free Food Supplement (Ensure Original), one  bottle per day for 60 days. This supplement was meant to  help plaintiff regain the muscle mass and weight he'd lost.

90.   The  order  for  Ensure  can  be found in Dr. Venkatesan report from the Oct. 30, 2015 consult with plaintiff. In that same report plaintiff's Body Mass Index - BMI can be found.

91.   This is important  because Dr. Venkatesan was aware of plaintiff's BMI data at  the time he prescribed the Ensure. Later plaintiff was denied Ensure by  the Pharmacy at the Byrd Unit claiming plaintiff's BMI score doesn't warrant the prescription.

92.   On  Nov. 9, 2015, plaintiff visited Mr. Curry after learning the Ensure had been denied. Plaintiff asked who had over-rode the G.I. Specialists orders.

Mr. Curry told plaintiff to take the issue up with the Pharmacy since they were who denied the Ensure.

93.    Plaintiff asked Mr. Curry if there was an alternative to the Ensure Food Supplement such as a Hyper-Choloric Diet. Mr. Curry became very angry at plaintiff's persistance. Mr. Curry shouted, "What are you, two years old. You want special treatment." Mr. Curry then stood up and told plaintiff to follow him.

94.    Outside of Mr. Curry's office and in the lobby of the infirmary Mr. Curry shouted angrily at the plaintiff in front of several inmates and TDCJ and UTMB staff members, "Get your ass out of here, I've got people who are really sick to take care of."

95.    Mr. Curry then instructed Ms. Granada, a TDCJ Correctional Officer, to escort plaintiff from the infirmary.

96.    On Nov. 12, 2015, Plaintiff submitted a grievance regarding Mr. Curry's conduct, the fact plaintiff was being treated for a disease he was told he didn't have and for the denial of prescribed Ensure Food Supplement. (See Exhibit N, 1-4).

97.    On Oct. 23, 2015, inmate Juan Guzman # 1610321 was placed in the cell with plaintiff. Mr. Guzman had just arrived from a county jail, Mr. Guzman was not tested for TB until five days later. This is the type of incident that Mr. Joe Morgan had previously told plaintiff was impossible to occur. (See Exhibit O, 1).

98.    On Nov. 17, 2015, plaintiff was transferred from the Byrd Unit to the Ellis Unit in Huntsville, Texas. Upon arrival plaintiff was screened by UTMB medical staff and complained of severe pain in his hands and abdomen. Plaintiff was told he would be seen by a doctor within a few days.

99.    On Nov. 25, 2015, plaintiff was sent to the infirmary after complaining

14.

of swollen hand and abdomenal cramping.

100. A nurse met the Plaintiff at the entrance to the infirmary but would not let plaintiff enter. The nurse told plaintiff there was no one on duty who could prescribe him medicines for the pain so he would have to wait to see the doctor.

101. When plaintiff asked when a doctor would be available the nurse told him the following week (five days later).

102. On Nov. 25, 2015, plaintiff submitted a grievance regarding the continued pain he was experiencing and other issues. (See Exhibit P, 1-2).

103. On Nov. 30, 2015, plaintiff was seen by Dr. Williams. The consult lasted less than five minutes during which time Dr. Williams refused to prescribe pain medicine for the issues plaintiff had with his hands and abdomen.

104. Dr. Williams also refused to refer plaintiff to a specialist about the swollen hand and abdomenal pain. Dr. Williams would not refer plaintiff to a dermatologist about the fungal infection.

At the conclusion of the meeting with plaintiff Dr. Williams smiled at plaintiff and in a condenscending tone said, "It was such a pleasure meeting you, welcome to Ellis Unit."

105. On Dec. 8, 2015, plaintiff submitted a grievance regarding Dr. Williams conduct and her refusal to address plaintiff pain issues. (See Exhibit Q, 1-5).

106. On Dec. 8, 2015, plaintiff wrote to Dr. Williams and asked her to discontinue the medicines he'd been prescribed to treat him for Crohn's disease since plaintiff had been told he did not have the disease. (See Exhibit R, 1).

107. Plaintiff had expressed concerns about the severe side effects of the medicines and how they might be related to the pain issues plaintiff was having.

108. Dr. Williams responded by saying the medicines were correct for his treatment and she would not discontinue them.

15.

109. On Dec. 14, 2015, plaintiff was scheduled to meet with Dr. Williams      a second time. This meeting lasted less than three minutes during which time Dr. Williams told plaintiff he should continue taking the medicines that had  been prescribed  to him to treat his Crohn's disease. Plaintiff asked Dr. Williams, "Do I have Crohn's disease," Dr. Williams would not respond.

110. At  that  point  in the meeting Dr. Williams changed the subject and told plaintiff  she wanted to do a digital rectal exam. She told plaintiff it would be  his annual prostate exam. Plaintiff had only been in TDCJ for three months at the time.

111. Plaintiff refused the exam claiming that his  bowel was full and he   had not yet had a bowel movement, Dr. Williams then told plaintiff to leave.

112. On that same day, Dec. 14, 2015, after the meeting with Dr. Williams, the doctor changed plaintiff's medical status to medically unassigned. As a result plaintiff was transferred the very next day. (See Exhibit S, 1).

113. On Dec.  16,  2015, plaintiff arrived at the Polunsky Unit in Livingston, Texas.  Upon  arrival  plaintiff's  medicines were continued from the previous institution  including  the  medicines  used  to  treat plaintiff for Crohn 's disease.

114. On Dec. 24, 2015, plaintiff visited with Dr. Ripsin at the Polunsky  Unit to discuss his concerns about taking medicines for a disease he had been  told he does not have and the side effects of those medicines. (See Exhibit T, 1-2).

115. At that meeting Dr. Ripsin reviewed the CT Scan from Oct. 15, 2015.   Dr. Ripsin  commented  that the results of the CT Scan showed, "no signs of active Crohn's disease." Plaintiff asked the doctor if he had Crohn's disease or  not and  Dr.  Ripsin  could  not confirm or deny if plaintiff had Crohn's or if he ever had the disease.

116. Dr. Ripsin had at her disposal archived medical records dating back     to

the original CT Scan in 2011 while plaintiff was in the Federal Complex in Beaumont. The CT Scan that was used to initiate treatment for Crohn's disease. Yet, Dr. Ripsin still could not confirm if plaintiff had Crohn's disease.

117. Dr. Ripsin then told plaintiff a colonoscopy was scheduled for March and a determination would be made then whether plaintiff had Crohn's disease or not.

118. Plaintiff expressed his concerns about the side effects of the medicines he was already experiencing and asked Dr. Ripsin to move the colonoscopy date to an earlier day. Dr. Ripsin told plaintiff he would not be adversely affected by the delay.

119. Plaintiff explained to Dr. Ripsin that he was having severe pain in his hands and abdomen as well as a fungal infection on his buttocks that had been present for over a year.

120. In response to plaintiff's concerns and complaints Dr. Ripsin first declined to have the colonoscopy procedure rescheduled though she had the authority to make such a referral.

121. Regarding the pain plaintiff was having Dr. Ripson refused pain medicines and would not make a referral for plaintiff to be seen by a Specialist for his hand pain.

122. Regarding the fungal infection. Dr. Ripsin prescribed a medicine that had previously been prescribed to plaintiff that was ineffective and that had actually made his condition worse. When plaintiff told Dr. Ripsin about this she responded, "Try it anyway, It will help." (See Exhibit U, 1).

123. Plaintiff then asked Dr. Ripsin if she would make a referral that plaintiff be seen by a dermatologist for the infection. Dr. Ripsin said she would make the referral and plaintiff observed the doctor making a note regarding the referral.

124. At a later date plaintiff learned Dr. Ripsin had not made the referral to a dermatologist as she said she would.

125. As a result of Dr. Ripsin denying plaintiff pain medicine and prescribing him medicines the doctor knew was ineffective, has caused his condition to worsen and plaintiff is constant debilitating pain.

126. On Dec. 28, 2015, Plaintiff consulted with Mr. Roark, a Physicians Assistant from UTMB-Galveston Hospital via TeleMed. Mr. Roark told plaintiff he was doing a follow-up consult to the colonoscopy plaintiff had recently had.

127. Plaintiff advised Mr. Roark that he had not had a colonoscopy but when he was in Galveston in October he was told one would be scheduled within two to three weeks.

128. Mr. Roark then told plaintiff that he would conduct the consult anyway and see if he could help. Mr. Roark reviewed the CT Scan results from October 2015 and commented that the procedure appeared to be "dirty." Plaintiff explained to Mr. Roark that his bowel was full during the procedure.

129. Based on the results of the CT Scan results Mr. Roark said it was impossible to make a firm conclusion as to whether plaintiff had, or even had, Crohn's disease. Mr. Roark was suspicious and said during the upcoming colonoscopy biopsy's would be taken and a determination would be made then.

130. Plaintiff then asked Mr. Roark to prescribe pain medicine for the pain plaintiff was having in his hands and abdomen. Mr. Roark denied that request.

131. At the time plaintiff did not have his medical records that noted "his pain does not seem to be related to Crohn's disease." However, plaintiff expressed his concerns to Mr. Roark that the pain might be from another condition that warranted further evaluation. Mr. Roark said to plaintiff, "Let's see what the colonoscopy shows."

132. Plaintiff asked Mr. Roark if he could have the colonoscopy procedure

18.

rescheduled for an earlier date since he was in pain. Mr. Roark said he could not reschedule the procedure.

133. Mr Roark told plaintiff that the medicines he was taking for Crohn's disease should help with the pain but Mr. Roark admitted the medicines might make the fungal infection worse.

134. Plaintiff reminded Mr. Roark that he had been taking the Crohn's medicines for years and yet the pain still persisted.

135. Plaintiff was then told by Mr. Roark that plaintiff would be seen by him again after the colonoscopy procedure in March.

136. On Dec. 29, 2015, Plaintiff submitted a grievance marked as "Urgent Medical Issue." That grievance was not signed by medical authority and was responded to on Jan. 26, 2016 (See Exhibit V, 1-2).

137. On Jan. 11, 2016, Plaintiff submitted a grievance marked as "Life Endangerment." That grievance was rejected as Redundant on Jan. 14, 2016. (See Exhibit W, 1-2).

138. On Jan. 12, 2016, Plaintiff submitted a grievance marked as "Urgent Medical Issues." As of Feb. 14, 2016, that grievance had not been responded to. (See Exhibit X, 1-2).

139. On Jan. 18, 2016, Plaintiff submitted a grievance marked as "Life Endangerment." As of Feb. 14, 2016, that grievance had not been responded to . (See Exhibit Y, 1-2).

140. On Jan. 28, 2016, Plaintiff was seen by Dr. Briscoe. At this meeting Plaintiff had waited five hours in a cage to see the doctor. Plaintiff explained to Dr. Briscoe that the long wait, sitting on cold, hard benches had caused him much distress.

141. Dr. Briscoe asked Plaintiff about the pain he was having, plaintiff explained that he was having pain in his lower right abdomen and hands that

had progressively gotten worse.

142. Plaintiff also expressed his concerns about taking medicines with serious side effects for a disease plaintiff had been told he did not have.

143. Dr. Briscoe could not confirm or deny whether plaintiff had Crohn's disease or not. However, the doctor did claim that continued use of the medicines would not adversely affect plaintiff's health.

144. During that same meeting Dr. Briscoe admitted that the fungal infection plaintiff had would not heal as long as he was taking HUMIRA for which he was taking for Crohn's disease.

145. Plaintiff explained to Dr. Briscoe that he had information regarding the side effects of HUMIRA and that one of the side effects indicate the body cannot fight against certain fungal infections and those infections can be fatal. Dr. Briscoe did not comment. (See Exhibit Z, 1-6).

146. Dr. Briscoe then admitted to plaintiff that the medicine Dr. Ripsin had prescribed to treat plaintiff's fungal infection would not be effective while plaintiff was taking HUMIRA.

147. Dr. Briscoe went on to advise plaintiff that Dr. Ripsin had not made a referral that plaintiff see a dermatologist but that she would make the referral herself.

148. Plaintiff asked Dr. Briscoe if she would make the referral as "Expedited" so the plaintiff would be seen within 30 days, Dr. Briscoe refused and said she would make the referral as "Routine," which would occur within 6 months. (See Exhibit AA, 1-2).

149. The visit with Dr. Briscoe resulted in no pain medicines being prescribed and no referral to a specialist regarding the pain. A routine (six month) referral was made to a dermatologist regarding plaintiff's persistant, and possibly fatal, fungal infection. And, finally Dr. Briscoe would do nothing to

20.

have the colonoscopy procedure rescheduled for an earlier date.

150. On Feb. 1, 2016, plaintiff was scheduled to see a health care provider. After waiting for an hour and facing the possibility of another five hour wait in a cage to see the provider, plaintiff signed a "refusal" claiming he could not physically endure such extreme conditions with his persistant health issues.

151. On Feb. 4, 2016, plaintiff submitted a grievance marked as "Medical Issue." As of Feb. 14, 2016, plaintiff had not received a response. (See Exhibit BB, 1-2).

152. On Feb. 4, 2016, plaintiff was again scheduled to see a health care provider. This appointment was to be with Dr. Ripsin and was in response to a letter plaintiff sent to Dr. Briscoe asking that the medicines prescribed to treat plaintiff for Crohn's disease be discontinued. (See Exhibit CC, 1-4).

153. Plaintiff refused the meeting with Dr. Ripsin for two reasons. One being plaintiff could not endure another five hour wait in the holding cage with his health issues.

154. The second reason for refusing to see Dr. Ripsin was because in his letter he had asked that the medicines prescribed to treat him for Crohn's disease be discontinued and a written response be given if the doctor agreed. Plaintiff had not asked for a consult.

155. Based on previous experience with Dr. Ripsin, Plaintiff has no trust in the doctors state of mine. Dr. Ripsin had prescribed medicines plaintiff told the doctor would make his condition worse. Also, Dr. Ripsin had said she would refer plaintiff to a dermatologist and she has not.

156. Finally, Dr. Ripsin had completely ignored plaintiff's pain issues when they'd previously met. Since that first meeting between Dr. Ripsin and the plaintiff in December of 2015, plaintiff's hand has swollen and he has only

about 50%  function in that hand. Additionally, the fungal infection continues
to persist.

### VI  CONCLUSION

157. All defendants named herein have access to the records of Plaintiff as it
relates to those particular defendants. Those same records Plaintiff has  used
as Exhibits to support his claim. The defendants are well aware of Plaintiff's
ongoing  medical  issues yet have acted with deliberate indifference to Plain-
tiff  serious  medical  needs  and  by  so doing have subjected Plaintiff to a
wanton  infliction  of  pain  and suffering needlessly for more than five con-
tinuous months causing irreparable harm to the Plaintiff.

### VII EXHAUSTION OF LEGAL REMEDIES

158. Plaintiff used  the  prisoner  grievance procedures available at the Byrd;
Ellis and Polunsky Units to try and solve the problem. On ten different occas-
ions  while at the various institutions Plaintiff submitted grievances. Plain-
tiff submitted both Steps 1 and 2 on most occasions and some of the grievances
were denied and some were never responded to. Plaintiff has included all those
grievances  as  Exhibits found throughout Chapter V under factual allegations.

159. Plaintiff would offer at this time that he went above and beyond in  his
attempt  to resolves his complaints by writing letters to officials in a posi-
tion  to  help. Plaintiff wrote numerous letters to the TDCJ medicial Director
and  to  State  Counsel  For Offenders. Plaintiff wrote to the Patient Liaison
Program, Ombudsman, Office of Inspector General, UTMB Director; and  a  State
Senator. All correspondences were answered with a form type letter that offered
no assistance or a denial. (See Attached - Letters & Request).

### VIII. LEGAL CLAIMS

160. Plaintiff realleges  and  incorporates  by  reference  paragraphs  1-159.

161. The deliberate indifference to Plaintiff's serious medical needs and  the

failure to protect Plaintiff from physical, mental and emotional harm has violated Plaintiff's rights and constitutes cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

162. The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this Court grants the declaratory and injunctive relief which Plaintiff seeks.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment:

163. Granting Plaintiff a declaration that the acts and omissions described herein violated, and continuous to violate, his rights under the Constitution and the laws of the United States.

164. A preliminary and permanent injunction ordering defendants to immediately terminate treating Plaintiff for Crohn's disease if it has not yet been confirmed that Plaintiff has the disease, and immediately transfer Plaintiff to UTMB's Galveston Hospital for a complete and thorough physical examination of all Plaintiff's chronic care issues and address those issues promptly, and immediately determine the cause and treat Plaintiff's ongoing serious pain issues, and reclassify and transfer Plaintiff to a TDCJ facility commensurate with Plaintiff's medical needs as determined by the Court ordered injunction for physical examination.

165. Granting Plaintiff compensatory damages in the amount of $250.000 against each defendant, jointly and severally.

166. Granting Plaintiff punative damages in the amount of $200,000 against each defendant, jointly and severally.

167. Granting Plaintiff nominal damages in the amount of $1.00 against each defendant, jointly and severally.

168. Plaintiff also seeks a jury trial on all issues triable by jury.

169. Plaintiff also seeks recovery of his costs in this suit, and

170. Any additional relief this Court deems, just, proper, and equitable.

Dated: _2/22/16_____

Respectfully submitted,

_Vaughn Monroe_____

_Vaughn Monroe #1967416_

_Polunsky Unit_

_3872 FM 350 South_

_Livingston, Tx, 77351_

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Livingston, Texas on _February 22,_____, 2016.

_Vaughn Monroe_____

Vaughn Monroe

24.